WILLIAM E. SCHUPPENHAUER, Plaintiff-Appellant, *v.* PEOPLES GAS LIGHT & COKE COMPANY, Defendant-Appellee.

(No. 59663;

First District (3rd Division)—July 3, 1975.

Roger Nelson, of Griffin, Guinan & Griffin, of Chicago, for appellant.

Karl Berolzheimer, of Ross, Hardies, O'Keefe, Babcock & Parsons, of Chicago, for appellee.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

In 1963 William Schuppenhauer filed an action for an accounting against the People Gas Light & Coke Company, for the company's use of cost-saving ideas allegedly disclosed by him in confidence 30 years earlier to company officers pursuant to an understanding that if his suggestions were employed by the company he would be paid an agreed proportion of the resulting savings. The cause was assigned to a master

in chancery to determine the truth of the allegations of the complaint and whether they gave rise to an enforceable obligation by the defendant. In 1966 the master heard the plaintiff's case which consisted solely of Schuppenhauer's own testimony, and received in evidence a number of exhibits. He submitted a report in 1969, and a supplemental report in 1971, concluding that the evidence demonstrated the company's liability. However, the chancellor sustained the defendant's exceptions to the reports, found that the competent evidence did not make out a prima facie case, and ordered the cause dismissed with prejudice.

Our disposition of Schuppenhauer's appeal turns upon the adequacy of his testimony regarding the events of 1933. The company officers with whom he conversed in 1933 were no longer living at the time he testified and his alleged conversations with them were stricken. He raises two issues: (1) whether, if all the conversations were properly stricken, there nevertheless remains in the record evidence of transactions with those officers which proves the creation of an enforceable obligation; and (2), whether the trial court erred in striking his testimony of conversations with and admissions by these agents which took place in the presence of another agent, Frank Griffith, who was living at the time Schuppenhauer testified, but who died after the plaintiff's case had been completed before the master.

In 1933, the plaintiff, a wholesaler of confections, operated the William E. Schuppenhauer Service from his home. Through the latter operation he promoted a cost-savings plan for firms with large billing operations. The plan was printed on a two-page folder and was summarized in the document's opening paragraph:

> "Write all drafts, checks, including dividend drafts or checks, invoices, requisitions, statements (not due), notices, etc., which are sent by mail in envelopes and can be condensed sufficiently, on postal or post-cards with or without a reply card attached and utilize all possible space thereon to bring about the desired result in conjunction with or without an exact copy for the files."

The plan envisoned savings in labor, paper and postage costs.

Schuppenhauer testified that beginning in July of 1933 he wrote repeatedly to solicit interviews with several officers of the defendant, including George Mitchell, its president. Carbon copies of several letters were introduced. The text of the July 15 letter to Mitchell is representative of these communications:

> "Dear Mr. Mitchell:—
> If we stop a profit 'leak',—you will increase your net profits.
> If you see and adopt our suggestion, our fees will be only a

portion of your savings for a short while for our services in bringing our Cost Cutting Plan to you. If you do not adopt our suggestion, YOU OWE US NOTHING. You will be the sole judge of the usefulness of the idea.

Certainly you can't lose. You can only win.

It costs you nothing to talk it over.

Just have your secretary return the enclosed post card.

Yours for greater net profits.

WM. E. SCHUPPENHAUER SERVICE."

Schuppenhauer produced two letters from Albert Tossell, assistant to Mitchell. The first said that his letters would be brought to Mitchell's attention, but the second, dated September 8, said that "* * * this Company is not interested in the service to which your previous correspondence refers." Notwithstanding this rebuff, Schuppenhauer testified that his persistence was rewarded when, on September 28, 1933, Mitchell telephoned him and arranged for him to meet Tossell. Schuppenhauer said he met with Tossell on the morning of October 5 and returned the same afternoon to speak to the company treasurer, William Weldon. The following day he described the plan to Moses Reeder, the comptroller of the company, and showed him sample card stock upon which checks could be printed. October 9 he sent copies of the printed plan to Reeder and Weldon by registered mail. He stated that on October 12 he met Reeder and Weldon in Reeder's office and demonstrated to them the electrical conductivity of graphite markings on card stock to prove its potential for machine processing after marking by meter readers. He suggested that the International Business Machines Corporation possessed the technology to build a processing machine. The group was joined by Frank Griffith, an assistant to Mitchell. In his presence, the others discussed various features of the plans as well as the measure of compensation for Schuppenhauer if his ideas were used by the company. Schuppenhauer later mailed a confirmatory letter to the persons with whom he had spoken, summarizing the discussion of October 12. Copies of this letter were submitted as exhibits. Schuppenhauer recalled that he prefaced every conversation with a reminder that his proposals were made in confidence. He had no further communications with any representative of Peoples Gas, but he claimed that in 1958 he learned that the company had begun postcard billing (mailed in envelopes) in 1951, and that after 1957 it sent its bills bimonthly, via stubbed postcards.

All of Schuppenhauer's testimony was received subject to the company's standing objection that it was incompetent because of the Dead

Man's Act. The company also objected to the admission of virtually all of the plaintiff's exhibits as self-serving and hearsay, since they consisted of his own notes, printed forms and carbon copies of communications purportedly sent by him to company agents.

It had been agreed by the parties that in order to conserve time the defendant's objections would not be ruled upon by the master until the close of the plaintiff's case. The hearings were recessed for that purpose in November 1966, but the master's report did not issue until January 1969. It had been stipulated that Weldon, Mitchell, Reeder and Tossell—the persons with whom Schuppenhauer negotiated in 1933— were deceased, and the master ruled that they were contracting agents within the meaning of section 4 of the evidence and depositions act (Ill. Rev. Stat. 1967, ch. 51, par. 4), and that under the statute Schuppenhauer's testimony of conversations with them was inadmissible except to show that there were transactions between the parties. The master ruled, however, that the conversation of October 12 would be admitted because Griffith, who witnessed the conference of that date but did not participate in it, was a surviving agent within the meaning of the statute. The master found the plaintiff's documents admissible to show transactions and that, based upon the admissible evidence, the liability of Peoples Gas had been established.

The question of the admissibility of the October 12 conversation was further complicated by Griffith's death 3 days after the master filed his report. The company's major exceptions to the report were that it purported to be a final report to the court although the case had been taken under advisement for the sole purpose of ruling upon objections to the plaintiff's testimony, and that Griffith's death before the defendant could present its case made the October 12 conversation inadmissible. Prior to the issuance of the master's supplemental report, the company waived presentation of an affirmative case, mooting its first exception. In his supplemental report, the master rejected the second argument. However, the chancellor found that the death of Griffith had rendered Schuppenhauer's testimony of the October 12 conversation inadmissible and that without it his evidence did not make out a prima facie case.

■■ The broad policy of the evidence and depositions act (Ill. Rev. Stat. 1973, ch. 51, par. 1 *et seq.*) is to allow interested parties to testify in their own behalf. But this rule of general competency is limited by requirements of mutuality—set forth in sections 2, 4 of the act—which are commonly termed the "Dead Man's Act," whose purpose is to enable parties to enjoy comparable positions with respect to testimony by them on material matters. (*Foster v. Hart* (1888), 29 Ill.App. 260; *Henry v. Tiffany* (1880), 5 Ill.App. 548; *In re Estate of Colewell* (1972), 9

Ill.App.3d 247, 292 N.E.2d 96.) When one interested party is incapable of testifying, the danger of undetected perjury by the other party is increased. Furthermore, the influence of a personal interest is likely to alter a party's perception of events regardless of his intent. Since self-serving statements are difficult to evaluate even with the benefit of cross-examination, they should not be admitted unless they can be balanced by the equally self-serving testimony of the opposite party.

Section 4 of the act provides:

> "[I]n every action, suit or proceeding a party to the same who has contracted with an agent of the adverse party—the agent having since died—shall not be a competent witness as to any admission or conversation betwen himself and such agent, unless such admission or conversation with the said deceased agent was had or made in the presence of a surviving agent or agents of such adverse party   *   *   *."

It is not disputed that under section 4 Schuppenhauer was incompetent to testify about his conversations with the deceased agents of Peoples Gas which occurred outside the presence of a surviving company agent. The parties differ, however, in their interpretation of the terms "surviving agent" and "conversations."

Schuppenhauer first contends that those aspects of his testimony and his exhibits which concern the general nature of his business in 1933, and the disclosures made by him to the defendant's agents are admissible as evidence of transactions, without regard to whether they occurred in the context of conversations with the deceased men.

■■ Although section 4 prevents a party from relating any conversations with or admissions by the opposing party's deceased agent, it does not forbid parol evidence of physical transactions with such agent (*Helbig v. Citizens' Insurance Co.* (1908), 234 Ill. 251, 85 N.E. 897). Parties have been held competent to testify that a deceased agent delivered documents and took payment (*Helbig v. Citizens Insurance Co.*) or made payment. (*People v. Borders* (1889), 31 Ill.App. 426.) On the other hand, neither the statutory language nor its purpose to place parties upon an equal footing may be evaded by indirection. Interested witnesses cannot testify to the substance and legal effect of a conversation in place of the actual words spoken. (*Henry v. Tiffany.*) Nor may one in Schuppenhauer's position dissect a conversation, telling his own statements and then supplying the import of the dead men's contribution by process of negation or implication. Like the Minnesota statute, our own act forbids the relation of a "conversation with" the deceased agent, and that "*   *   * is not a one sided affair in which only what the decedent

said is to be considered." *Pomerenke v. Farmers Life Insurance Co.* (1949), 228 Minn. 256, 36 N.W.2d 703.

When the inadmissible conversations are swept away, some portions of Schuppenhauer's testimony remain. In addition to the description of his background and the general nature of his business, he could competently relate that in the summer of 1933 he repeatedly solicited interviews with representatives of Peoples Gas by mail, assuring them that, "It costs you nothing to talk it over"; that eventually he met several times with officers of the company and that during those meetings he displayed samples of perforated, stubbed postcards to them and mailed them copies of his printed plan. But none of the evidence explains the nature of the understanding reached between Schuppenhauer and the defendant. The omission is a fatal one under the theory upon which the case was brought.

■■ The complaint charged that by confidentially communicating his ideas to the defendant's agents, Schuppenhauer became the beneficiary of a fiduciary relationship. An idea may, it is true, be disclosed in such a manner that its recipient may incur a binding obligation not to use the idea commercially and not to disclose it, except as contemplated by the negotiations. (*Booth v. Stutz Motor Car Co.*, 56 F.2d 962 (7th Cir. 1932).) But when ideas or plans are come by under circumstances imposing no restraint, such as by voluntary communication, they may be used without any obligation to account. (*Hughes v. West Publishing Co.* (1922), 225 Ill.App. 58.) The fact that business transactions are conducted does not justify an inference of a fiduciary obligation. So, unless the alleged confidentiality is predicated upon a preexisting relation of trust with the disclosee-defendant, it is incumbent upon a plaintiff to show not merely that he meant to place confidence in the defendant, nor even that he expressed that intent, but also that the defendant at least impliedly accepted that confidence and agreed to respect it. (See *Allen-Qualley Co. v. Shellmar Products Co.*, 31 F.2d 293 (D.C. Ill. 1929), aff'd, 36 F.2d 623; *Booth v. Stutz Motor Car Co.*) Granting that Schuppenhauer disclosed his plan and mailed copies of it to the defendant, that says nothing about the understanding with which it was received. And the Dead Man's Act prevents him from explaining the nature of any agreement reached during his conversations.

The admissibility of the conversation with Reeder and Weldon which occurred in the presence of Griffith on October 12, 1933, depends on the posture of the master's hearing at the time that hearing adjourned. As we have noted, the statute permits the relation of such a conversation if it took place in the presence of a surviving agent. However, if a party

testified about a conversation heard by a surviving agent and the agent dies before the opposite party has an opportunity to oppose the testimony, the testimony is rendered incompetent. (*Smith v. Billings* (1898), 177 Ill. 446, 53 N.E. 81.) The gas company asserts that it had no opportunity to call Griffith as a witness because the hearing was recessed—to allow the master to rule on its accumulated objections—before it presented its defense. On the other hand, Schuppenhauer asserts that the company waived any objection to the October 12 conversation when it agreed to present no affirmative case of its own. He further argues that the availability of a partial discovery deposition given by Griffith places him and the company in comparable testimonial positions and therefore his testimony of the October 12 meetings is competent.

■■■ An objection on the ground that a surviving agent has died before contradictory testimony can be presented may be waived, if the objecting party has in some way manifested his satisfaction with the state of the evidence prior to his agent's death, *e.g.*, by choosing not to call him as a witness at the appropriate time. Or, even when no grounds for waiver appear, the court may find that the purpose of the Dead Man's Act to achieve mutuality has been met. Both of these circumstances were present in *Brubaker v. Gould* (1962), 34 Ill.App.2d 421, 180 N.E.2d 873. Gould died before presenting his defense, but the majority of a divided appellate court decided that he had nevertheless had a full opportunity to present his version of the events related by his opponent. The court emphasized that Gould had been called by the plaintiffs to testify under section 60 of the Civil Practice Act and was also examined by his own counsel at that time. Further, when he died, the case was under the master's consideration on his motion for a finding in his favor, filed at the close of the plaintiff's case. This the court accepted as evidence of Gould's satisfaction with the comprehensiveness of the evidence of record.

Schuppenhauer claims that the parties decided in November 1966, to submit the case to the master for final conclusions based solely on the plaintiff's evidence, but that the gas company, when surprised by an adverse finding in 1969, objected to admission of the October 12 conversation and insisted that the master's report was premature. We find this claim unsubstantiated by the record, and indeed, no mention of waiver appears in the master's supplemental report. At the outset of the 1966 hearings it was agreed that all of Schuppenhauer's testimony would be heard before the master ruled on the defendant's objections to it. When Schuppenhauer had finished testifying he chose to close his case; at that time he expected that the company would present a case of its own. His counsel explained:

"We close our affirmative proof with regard to the matters sub-

mitted in the limited reference except as stated, that we reserve the right, and we understand it is agreed that we may do so, to put in additional proof for the purpose of rebutting the affirmative defenses which might be raised under the limited reference."

The master then directed each party "* * * to file a brief with reference to its position on the Evidence Act relative to Mr. Schuppenhauer's testimony * * *." No other communication among the parties and master appears of record until his report was issued in January 1969, 3 days before Griffith's death. In February 1969, the defendant filed its objections, complaining that the report had exceeded its previously agreed scope and that the conversation in Griffith's presence was now incompetent because of his death. Much later, in 1970 or 1971, the company agreed to present no case in order to expedite matters. It is clear from this chronology of events that at the time Griffith died the defendant had not agreed to forego the presentation of its case. When the company did waive its case at the later date, that did not operate retroactively to retract its 1969 objection to the admission of the October 12 conversation.

■■ Nor was the defendant in any way estopped from raising this objection because of the long delay while the master prepared his initial report. If the delay is chargeable to anyone it is to the master. In any event, the use of conventional trial procedure, such as an ongoing motion challenging the competency of testimony, is not inherently an instrument for delay. To the contrary, such a devise promotes and serves judicial economy.

The provisions of the Dead Man's Act should be applied in a manner which effectuates its purpose (*Hill v. A. J. Canfield & Co.*, 157 F.2d 849 (7th Cir. 1946)), and strict application of the policy of mutuality can nowhere be more appropriate than here, where one party purports to vividly recall conversations which for most men would at best be faded memories. Unlike *Brubaker v. Gould*, there was no equality of testimony between the parties regarding the October 12 conversation. Griffith was not called by Schuppenhauer to testify under section 60 and no statements by him about the matter at issue appear of record. His incomplete discovery deposition, taken by the plaintiff, is not an acceptable substitute for testimony in court. Far more reliable records, such as a transcript from a previous trial, have been rejected when tendered for such a purpose. *Trunkey v. Hedstrom* (1890), 131 Ill. 204, 23 N.E. 587.

■■ The chancellor correctly sustained the exceptions of the defendant to the master's reports. The plaintiff's evidence, as it is limited by application of the Dead Man's Act, is simply insufficient to demonstrate that

the company ever incurred any obligation to him. Further, nothing in the record suggests that Peoples Gas was guilty of fraud or was unjustly enriched. (*Cf. Allen-Qualley Co. v. Shellmar Products Co.*) Rather, the two-decade delay before the company began to implement business practices having any similarity to Schuppenhauer's ideas compels the conclusion that his suggestions were dismissed as impractical in 1933.

The judgment of the circuit court is affirmed.

Affirmed.

McGLOON, P. J., and MEJDA, J., concur.